Do we have an appellant's counsel on Zoom, or? Sorry, Your Honor, I forgot to turn the video on. Okay. Go ahead and make your appearance. Reagan Powers from Davis Wright for Bank United. Okay. As appellant's counsel, do you want to reserve a little time for rebuttal? Yeah, I'll reserve five minutes. And if we approach the 10-minute mark and the court has questions, we'll run over. That's up to you. Yeah, no, it's up to you to dispose of the time as you like. But if you're getting close to that five minutes, we'll probably try to give you a heads-up. Okay? Thank you very much. Okay, you may proceed. Okay. May it please the Court, the debtors in these administratively insolvent cases entered into a sell agreement that provided them with a million dollars in cash to pay professionals, along with a share of Bank United's other proceeds, which included indirect proceeds from the sale of four multifamily complexes. The agreement was set up to ensure that the sharing arrangement encompassed all of the funds the debtors received in connection from the sales or from the properties, including 506C claims and other administrative claims. Had the sales proceeded as anticipated, the sharing arrangement would have solved the administrative insolvency. Unfortunately, it did not. This appeal centers on the debtors' attempt to circumvent the terms of the settlement agreement and take an extra 25% off the top of the proceeds from one of the properties known as Tanglewild. This morning, I plan to discuss four topics. The first is the standard of review. Second is the unambiguous language of the contract. Third, the errors in the bankruptcy court's decision. And fourth, the debtors' argument that by labeling the $300,000 payment as a carve-out for a professional fund somehow meant that the settlement agreement did not apply. Let me turn first to the standard of review. The settlement agreement is a contract. Section 19 of the settlement agreement says Washington law applies to the extent federal law does not. This is a Washington contract, basically. And under Washington law, a motion to enforce a settlement agreement is de novo review. And under Washington law, it is not within the court's purview to very contradict or modify the written words in a contract. And that is what the bankruptcy court did in a couple of areas that we will discuss. With respect to the settlement agreement, the debtors gave a million dollars in cash that would otherwise not have been available to pay professionals, plus a share of the proceeds from Bank United's collateral. Section 3 of the settlement agreement governed proceeds from the sale of the four multifamily properties. Section 3A2 dealt with Tanglewild, and it said proceeds are to be dispersed as follows. First was closing costs. Second was amounts due to Buchanan, which was the secured creditor and which was the source of the $300,000 that is at issue here. The Buchanan agreed to accept $38 million in satisfaction of its claim. And it was paid $38 million plus some additional interest at the closing and the closing statement that is in the record confirms that. $300,000 of the proceeds came out and went to from the sale and went to the debtors. That's undisputed went from Tanglewild to HCDI which was the parent. Our position is that the amount due to Buchanan after entry of that stipulation was $38 million. Section 3A goes on to provide for payment of lien claims, and then Section 3A2 provides for payment of unsecured claims of Tanglewild, which included $12.7 million owed to HCDI, which was Bank United's collateral, and which was to be paid to Bank United. Bank United agreed to share the proceeds of that collateral with HCDI so that it would have enough money to pay its or have money to pay its professionals, and that sharing arrangement is in Section 12 of the agreement. Section 12 of the agreement provides for division of the proceeds, including 50% of the first 200 going to the professional to the debtor. In the middle of the paragraph, there is language that is the focus of this appeal, which says for the multifamily parties, which includes Tanglewild, any net proceeds received by the debtors on account of 506C claims or other administrative claims against Belfair, Apartments, Tanglewild, Bridgeview, or Pacific Ridge shall be subject to the same carve-out, essentially an 80-20 split. How does the agreement work after that? Proceeds left for distribution under subparagraph 4, what was paid after payment of costs, what was paid to Buchanan and a reserve for lien claims, which turned out not to be much of a reserve, went into this sharing arrangement between first the Tanglewild estate and then between Bank United and HCDI. The debtor's argument is that no, Buchanan was paid $38.3 million and gave $3,300,000 to HCDI for a professional fund. Excuse me, counsel. That's because the claim was $40 million and was settled for $38 million plus a carve-out. That's what the debtor's position is. That is the debtor's position. And what's your position why that can't be correct? Our position is that the agreement says, under the agreement, Buchanan was paid $38 million. But it settled a $40 million claim for payment of $38 million with a carve-out. That's right, because there was a big dispute with Buchanan over the amount of the interest that they were really entitled to. So you're saying that if there was any proceeds above whatever their main claim was, whether it was $300,000 or something more than $300,000, as long as they were agreed to release their lien for $38 million, everything else has to be considered proceeds, net proceeds. That's right, and that's what the agreement says. So how about the fact that it's not paid to the debtors? It's paid to a professional fund. It was paid to the debtors, actually, and the term professional fund is actually nowhere defined in the plan. I appreciate that, but it isn't received by the debtors, is it? It's paid to a fund that is maybe controlled by the debtors, but it's not their money to work with at that point. That's not what's reflected in the plan or in the confirmation order, Your Honor. And, in fact, this issue came up earlier in the case. At the very beginning of the case, the debtors wanted to establish a professional fund, which would have a kind of a super senior priority over all other administrative claims, and the court denied that and said that was property of the estate. The other point I would make is that the plan itself confirmed that all assets were property of the estate. And that's reflected in the debtor. I'm sorry to interrupt you. I'll move to the next point, which was that then can you help me with the issue that it was a requirement under the split that the money be paid on account of 506C claims or other administrative claims against the Tanglewild property, and how were they asserted by virtue of a carve-out? Well, I think you just hit on one of the significant errors in the court's decision, because the court assumed and said that the debtors actually had to assert a claim for 506C surcharge or for administrative expenses. That's not what the agreement says. And we all know that people all the time negotiate for payment of administrative expenses or for 506C surcharges without filing a proceeding. And that's actually one of the errors in the court's decision. She assumed, and because the debtors had suggested that was a requirement, that they had to have actually filed a motion or an adversary proceeding or some other proceeding to collect that money. That's not what the agreement says. Can you quote from that section? I think it's 12, isn't it? It says, for multifamily properties, any net proceeds received by the debtors on account of 506C claims or other administrative claims. She didn't make that up. That's in the agreement. That's in the carve-out provision. That's right, and that's what it says. But it doesn't say that the debtors had to bring a proceeding for that, right? They had to assert a claim. Didn't they have to? It doesn't say they had to assert a claim. It says on account of a 506 claim. So how do you get to a 506 claim without somebody asserting a claim? You can go sit down and have a discussion with somebody, right, and say, I want you to pay a portion of administrative expenses, and look. Well, you can't include the judge in that discussion. That's part of the problem, right? I mean, I don't know what the metaphysical, you know, you're going to look into the soul of the person next to you to see whether they have a claim or not. That's got to be asserted, doesn't it? In what fashion, though? You tell me. Well, I think people all the time sit down. People sit down all the time and negotiate carve-outs without – Without court authority? No, without – there is court authority here because this agreement was approved by the court. But people all the time go negotiate for payment of administrative – I'm not getting the significance of your argument here at all. The argument – the point here is the judge said that in order for this section to apply, the debtors had to file a motion to surcharge collateral. That is not what the agreement says. The agreement says any recoveries on account of 506c claims or administrative claims. This was a recovery on account of administrative claims, i.e., money for the payment of professionals, which is administrative claims. There's nothing in this agreement that says that required as a precondition to that applying that the debtors had to go file a motion. And, in fact, that would not have ever been part of an agreement. Nobody would ever agree to that because what it means is the debtor can go negotiate for – as long as the debtor doesn't file a motion, it can circumvent this agreement and go collect administrative claims and administrative expenses with people and not have the agreement apply. That wouldn't make any sense. Okay. You're at four minutes. Do you want to reserve at this point? Sure. Okay. Good morning, Your Honors. Bina Young here on behalf of the appellees, the debtor in this Chapter 11 matter, Harbor Custom. If it pleases the court, I'll just go ahead and start by addressing some of the comments made by Mr. Powers as well as the questions from the bench. And I think the thing that I would like to start with is this idea, this argument that's been made over and over again in the briefing by Bank United that they were entitled to a cut of all of the funds debtors received. And they say it multiple times. They say that's what this settlement agreement was about. This is how it was set up. We were entitled to some cut, you know, the 80-20 split of all of the funds the debtors received. That is not correct. If you look at the language of Section 3 and Section 12, which apparently everyone has, there's two components to the definition of what gets subject to the Bank United split. And the way I think about it is you can look at the source of the funds and you can look at the destination of the funds. As to the destination of the funds, it's funds that the debtor receives. Okay. I get that, right? If it wasn't money that the debtor got, we wouldn't be here fighting about it. But that can't be the only factor. That can't be the only thing that we look at because then truly any money that the debtor received from any source would be subject to this Bank United split. And that simply is not supported by this agreement, and it's not what the debtor agreed to or would have agreed to. So then you have to look at the source of the funds. And that's where the rest of the language in Section 12 comes into play. And it's been read before. It's any net proceeds received by the debtors on account of 506C claims or other administrative claims against the properties, and that includes this Tanglewild property. So let's look at the source. Judge Heston made a finding in her ruling that the funds that we're fighting about here were a carve-out, aka voluntary payment, these are her words, that Buchanan agreed to contribute out of its secured claim to the debtor's professional fund from its collateral. That is a factual finding, and that's a factual finding made by Judge Heston. It's subject to review based on clear error. I don't think that there's any way that this panel here can find clear error in that finding because her finding is based on her read of the record as well as the confirmed plan. And the confirmed plan, as has been stated many times before, references a $300,000 carve-out from the Buchanan claim. And, Judge Gann, you made a really great point, which is we compromised a $40 million claim for $38 million. And if you look at the chart that's in the appendix, the $300,000 that we're talking about here actually did come out of the $38 million compromise claim amount. And so there's plenty of support in this record, including this confirmed plan for Judge Heston to find that the money at issue was sourced from a secured creditor carve-out. To me, frankly, that's kind of the end of the discussion. If this creditor, if Buchanan had decided to do this carve-out and then donate it to the SPCA, would Bank United have any standing to raise issue with that? No, it wouldn't. It can't have any say into what another creditor does with its secured claim, its collateral, proceeds of its collateral. And so really the only difference between Buchanan taking those funds and donating it to the SPCA versus contributing it to the debtor's professional fund is that it is money that ultimately went to pay the debtor's professionals. And that's a destination issue. And as I've discussed, the destination of the funds cannot be the determinative factor under this agreement. So that's the first thing I'd like to address. And I really think that is the biggest thing. If this court has any questions about whether Buchanan as a secured creditor could determine the disposition of proceeds from its own collateral, I'm happy to ask them. But I think that's a pretty well-settled concept both under the law as well as in everyday practice in bankruptcy courts. Next, I'd like to just briefly address this argument that the monies were paid to the debtor. It wasn't paid to the professional fund. How do we know that? I don't think that there's anything in this record that actually tracks the specific routing of the money out of escrow either to an earmarked account that we are referring to as the professional fund or directly to the debtors or to Buchanan and then subsequently to the debtors. So I don't think that there's anything in the record on that specific fact. But I don't think it matters. I don't think it matters what route those funds took. Because the fact that those funds are from a creditor carve-out means that the very first step had to be that it went from the property to the secured creditor on account of their claim. And whether you're tracking the specific routing of funds through different bank accounts, it doesn't matter. Because ultimately it had to be going to Buchanan first as the senior secured lender on this property. And then subsequently whether it goes to the debtors or to the professional fund doesn't make a difference. It's money that came out of that creditor's claim. And so to me that's a distinction without a difference. Third, I want to address the language that Judge Heston used in her oral ruling. And she did say, she did make reference that, you know, there was no motion filed here. There was no adversary proceeding. And I think your honors are exactly right. You know, what's a claim if it's not asserted? And Bank United is here trying to tell us that, oh, a claim is not really a claim. You know, it could just be a feeling that you talk about with others. That's not what a claim is. But I want to shift, I think, the focus from that just a little bit. Because, again, I don't think it really matters. The language of Paragraph 12 is very clear. The net proceeds need to be received on account of the claims. Okay, let's set aside for a minute, you know, is it a claim if you don't make it? Is it a claim if you don't file a motion or file an adversary proceeding? And let's talk about on account of. On account of means causation. It means that something happened first. And then on account of that, because of that, something happened later. And what's described in this paragraph is that the first thing that needs to happen is you have a claim. And then on account of that claim, you've got some net proceeds that you can later fight about. Regardless of whether a claim was asserted or by motion or adversary proceeding or surcharge, anything like that, which, again, I think it's in the record what happened. No claim was filed against a subsidiary entity. But, again, it doesn't matter. The timing here cannot support the position that Bank United is taking. Because the carve-out was negotiated first. The carve-out with Buchanan was negotiated from the very beginning. From the very moment this debtor started to put together its plan, its disclosure statement, started talking to its creditors, it had contemplated that Buchanan carve-out. And I believe that was in March of 2024. And that's in the record. So you've got the carve-out that comes first. And then later on, you have an application for payment of professional fees, which is not an administrative claim filed against Tanglewild. It's not a 506c claim filed against Tanglewild. It's not a surcharge against the property. It's the application for professional fees made at the parent company level. How can this thing that happened later in time, the debtor's fee application, cause the carve-out that happened months earlier? That causation is simply not there. Is it possible that you negotiated a settlement with B Bank United? Then you decided that you needed to have money paid for administrative expenses. You negotiated a carve-out. In order to avoid the agreement, you put it in a plan as a carve-out, knowing that the administrative claims would be made later. And that way you preserved your right to use the funds but avoid the application of the settlement. I think that's what their argument is.  And I believe that the carve-out itself, that concept came up before any resolution was reached with Bank United. And so I still don't think that the timing really tracks. But that's a great point because let's say hypothetically it does. Okay. What was Bank United's remedy? And I think Mr. Powers made a comment that if the debtors are going to get away with this, then they can be out there negotiating whatever they want with all of their creditors, and they can circumvent the settlement agreement, and they can cut all sorts of side deals, and that's a huge problem. Okay. That's not what happened, first of all, and it's not in the record. But let's say hypothetically that is a possibility. Your remedy is to object to the plan. It was stated in every iteration of the plan that's clear from the record. Bank United filed a generic reservation of rights. If it had real objections, those were not sustained. Even if it wanted clarification, all it had to do was file an objection and say, we don't understand whether we're going to get the money or not. Exactly. And it didn't do that. It didn't do that. And the court confirmed this plan, and the fact that we're dealing with not just a settlement agreement between Bank United and the debtor here but also implications and impacts on a confirmed plan, that's huge. Because in order to upset what's already happened, you would have to go back and then say, okay, the terms of this confirmed plan, they're not actually what Judge Heston said they were in the order. We're going to redo this completely. I don't know what Buchanan is going to do about that. I mean, we take the position that if these funds don't come to the professional fund, they're actually going back to the secured creditor that carved them out in the first place. And so I think the sanctity of a confirmed plan is a huge component of this because that was Bank United's chance to raise its objections. It had multiple opportunities. It didn't do it. The Buchanan carve-out was clearly laid out. So those two steps also is confirmation where they could have objected. There's a form of order that's presented that they could have also objected to if they wanted to. Multiple opportunities that were not taken here. They might say, well, we filed a reservation of rights and we filed this objection, but we can't operate that way, right? We can't have creditors just filing these two-page generic reservations that don't actually raise the issue. And they didn't prevent the confirmation of the plan or the order from being final by virtue of whatever reservation they had. Those things occurred. Yeah, they occurred. The time for appeal on confirmation of the plan has passed. It's long passed. And so truly from the debtor's perspective, this is a little bit of an end run around a dispute about plan confirmation. They're framing it as Section 12 of the settlement agreement, but more is implicated. And it's implicated by virtue of the fact that this money, as Judge Heston found, based on the record, was sourced from a secured creditor carve-out. And they can do whatever they want with it. That, I think, is a settled principle. And to me, that's really the end of the analysis. I was determined to make the most of my time up here and answer any questions that you have, but I really don't want to beat a dead horse because I think that truly is the crux of what we're dealing with here. And so if the panel doesn't have any further questions, I would just ask that you. Okay. Thank you very much. Thank you. Okay. Okay, you've got a little over four minutes. And you're muted. There we go. There you go. Let's go back and talk about the claim, the quote-unquote claim issue. Claim is defined in the bankruptcy code, right? We all know that. In Section 1015, I think. It doesn't mean – claim doesn't mean that you have to file a lawsuit to assert the claim. You just have a claim, right? The language in Paragraph 12 refers to claims. It doesn't refer to lawsuits or motion 5060 surcharge motions. It's just on account of a claim. These payments, regardless of whether you call them a carve-out or something else entirely, they were on account of administrative expenses, right, for payment of the professionals. And it says it goes into professional fund, which is designated for the professionals. So it was a claim on account of administrative expenses. And Judge Heston got it wrong when she said that you had to actually file a lawsuit or bring an adversary proceeding. That's point number one. And, by the way, Section 20 of the claim treatment agreement refers to words used in the agreement as being defined, if not otherwise defined in the agreement, as defined in the bankruptcy code, not in some other fashion. So then let's talk about the timing issue. The debtors, I mean, counsel talked about the timing of the discussion of a carve-out with Buchanan. The debtors didn't ask for exclusion of that from the claim treatment agreement. The claim treatment agreement seems to me pretty clear that it covers what they were talking to Buchanan about, which was recovery of some administrative expenses for the professionals. Okay. So I think that addresses that timing issue. They didn't ask to have it excluded. I think the agreement covers it. Let's talk about the confirmation. That was the other point that the court raised. The plan says in Section 1H, I believe, it says that we will get the distributions provided for in the claim treatment agreement. That's what it says. And the claim treatment agreement was actually incorporated into the plan. So there's nothing in the plan. Well, but the counsel, didn't the plan specifically indicate that there was a carve-out of $300,000 in one of the exhibits that was attached? In other words, it didn't label it as a payment. It didn't label it as a claim satisfaction. It labeled it specifically as a carve-out. Absolutely. And the debtors at page 18 of their brief, I mean, they basically say that they thought they could get around the claim treatment agreement by labeling something a carve-out. But if you weren't sure, wouldn't it require you to object, clarify? No, because our agreement is very clear. We didn't need to object. Whether they called it a carve-out or a moonshot or whatever they called it, it was paid to the estate on account of administrative expenses. That's what it was. And the claim treatment agreement doesn't refer to the Buchanan carve-out. So I have one other question, and that is you assert that a claim could be ethereal, so to speak. When I say that, I mean that somebody could believe they have a right to payment. They could call you up and say they have a right to payment. But doesn't the concept of claim under the code contemplate either filing of a proof of claim or a motion to assert a claim? In other words, somebody doesn't have to deal with claims in a bankruptcy case that are either not asserted or filed but are simply claims that somebody believes they might have. I think that we are misusing the word claim here because my time is about up. The term claim in the administrative claims means recoveries for payment of administrative claims of the estate, right? That's what that refers to. It doesn't refer to somebody having to file a lawsuit to collect administrative expenses. I'm sorry. Go ahead. But I think what Judge Gann is getting at is the notion of a claim definition is to set forth the broadest possible analytical basis for it. It doesn't tell you how to assert it one way or the other, right? Right. So if so, but that, I mean, I don't think that helps you. I mean if 101-5 says a claim is any right to payment, that is the basis of the claim. It doesn't tell you how, it doesn't say, oh, by the way, if you have that, you don't have to file a proof of claim. But the language in this, again, I think the Court's confused. The language in this contract is that we're making recoveries for administrative claims, payments for professionals, that somebody is making a recovery for payment of administrative claims. That's what that language is directed to, not that somebody has to go assert a claim. It's that we are getting recoveries for claims. Anybody have any further? See my time is up. Okay. Yeah, all right. Thank you very much. Thanks for your good arguments. We will take it under submission and get you a written decision as fast as we can. Thank you. Thank you. Thanks. Thank you.
judges: Lafferty, Spraker, and Gan